USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/2/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
DAGHRIB SHAHEED,                                                  :
                                                                  :
                              Plaintiff,                          :
                                                                  :
                                                                  :
                    -v-                                           :          14 Civ. 7424 (PAE);
                                                                  :          15 Civ. 3480 (PAE)
THE CITY OF NEW YORK, NEW YORK CITY                               :
POLICE OFFICER STEPHAN KROSKI, NEW YORK                           :          OPINION & ORDER
CITY POLICE OFFICER PAUL BLISS, NEW YORK                          :
CITY POLICE OFFICER JONATHAN RODRIGUEZ,                           :
and NEW YORK CITY POLICE OFFICER LYDIA                            :
FIGUEROA,                                                         :
                                                                  :
                              Defendants.                         :
                                                                  :
------------------------------------------------------------------X
                                                                  :
WAHEEDAH SHAHEED,                                                 :
                                                                  :
                              Plaintiff,                          :
                                                                  :
                                                                  :
                    -v-                                           :
                                                                  :
THE CITY OF NEW YORK, NEW YORK CITY                               :
POLICE OFFICER STEPHAN KROSKI, NEW YORK                           :
CITY POLICE OFFICER PAUL BLISS, NEW YORK                          :
CITY POLICE OFFICER JONATHAN RODRIGUEZ,                           :
and NEW YORK CITY POLICE OFFICER LYDIA                            :
FIGUEROA,                                                         :
                                                                  :
                              Defendants.[*]                      :
                                                                  :
------------------------------------------------------------------X

---

[*] The Clerk of Court is respectfully directed to amend the captions for these consolidated cases as set forth above.

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Daghrib Shaheed ("Daghrib") and Waheedah Shaheed ("Waheedah") bring these consolidated actions under 42 U.S.C. § 1983 and New York state law against the City of New York (the "City") and several New York Police Department ("NYPD") officers. As a result of this Court's prior decision dismissing plaintiffs' federal claims for municipal liability, plaintiffs' remaining claims are for false arrest, false imprisonment, deprivation of substantive due process, excessive force, malicious prosecution, intentional infliction of emotional distress, assault, and battery. These claims arise from two incidents: one on June 6, 2012 (the "June 6 incident"), and the other taking place between June 29 and June 30, 2012 (the "June 29–30 incident").

Pending now is defendants' motion for partial summary judgment. Defendants seek summary judgment in their favor on: (1) all claims arising out of the June 29–30 incident; (2) both plaintiffs' claims for deprivation of substantive due process and intentional infliction of emotional distress arising out of the June 6 incident; and (3) Daghrib's claims for excessive force, assault, and battery arising out of the June 6 incident.

For the reasons that follow, the Court grants the motion in all respects except insofar as it seeks dismissal of Daghrib's claims for excessive force, assault, and battery arising out of the June 6 incident. The effect of this decision is to dismiss all claims arising out of the June 29–30 incident and to preserve for trial all claims arising out of the June 6 incident save the claims for deprivation of substantive due process and intentional infliction of emotional distress.

## I.  Background

### A.  Factual Background[1]

_____

[1] As explained in the Court's prior opinion, this case began as two separate cases, which were later consolidated. As a result, each plaintiff's amended complaint appears on a separate docket.

### 1. The Parties

In June 2012, plaintiff Waheedah Shaheed lived with her four children: plaintiff Daghrib Shaheed, age 25; Noah Shaheed, age 20; I.O., age 15; and A.A., age 11. Pl. Counter 56.1 ¶¶ 4–5. At all relevant times, the family lived together in an apartment on East 129th Street in Manhattan. *Id.* ¶ 6. Waheedah and Daghrib were tenants on the lease of the apartment. *Id.* ¶ 7.

At all relevant times, each of the four individual defendants was an NYPD police officer. *Id.* ¶ 3. Each was assigned to the 25th Precinct in Harlem. *Id.*

### 2. The ACS Investigation

On May 29, 2012, officials at I.O.'s school reported seeing marks on I.O.'s arm, which they believed resulted from self-inflicted harm. *Id.* ¶ 8. The school requested that Waheedah take I.O. to receive medical care. *Id.* ¶ 9; *see also* Arko Decl. Ex. I ("Waheedah Dep.") at 80. Waheedah, who suffers from several health conditions, including cancer (multiple myeloma) and

---

*See* No. 14 Civ. 7424, Dkt. 65; No. 15 Civ. 3480, Dkt. 56. Apart from the complaints, which allege the same essential facts but raise slightly different claims, the materials on each docket are identical as relevant here. Accordingly, unless otherwise specified, all docket numbers cited in this opinion refer to the docket in 14 Civ. 7424.

The Court draws its account of the underlying facts from the parties' respective submissions on the motion for summary judgment, including defendants' Statement Pursuant to Local Civil Rule 56.1, *see* Dkt. 98 ("Def. 56.1"); plaintiffs' counter-statement, *see* Dkt. 108 ("Pl. Counter 56.1"); the Declaration of Christopher G. Arko in support of defendants' motion, Dkt. 99 ("Arko Decl."), with attached exhibits; and the declaration of Lawrence P. LaBrew in opposition to defendants' motion, Dkt. 110 ("LaBrew Decl."), with attached exhibits.

Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

a heart condition (mitral regurgitation), explained that she was not feeling well enough to go and that school officials were overreacting. Waheedah Dep. at 43, 80. After Waheedah refused to come to the school, I.O. was sent by ambulance to the hospital with the school nurse. *See* Pl. Counter 56.1 ¶ 9; Waheedah Dep. at 80–81.

Although the hospital released I.O. to Noah, *see* Waheedah Dep. at 81, the New York City Administration for Children's Services ("ACS") opened an investigation against Waheedah for inadequate medical care and inadequate guardianship, Pl. Counter 56.1 ¶ 10. Between May 29, 2012 and June 6, 2012, ACS Child Protective Specialist Shannon Aste called and visited Waheedah several times to inform her of the investigation and to discuss the allegations. Pl. Counter 56.1 ¶ 11. At each visit, Waheedah refused to let Aste into her apartment. *Id.*

On June 5, 2012, Aste told Waheedah over the phone that Waheedah was required to appear at a child safety conference the next day, and that her failure to appear might result in ACS's seeking court intervention. Arko Decl. Ex. K ("Aste Decl.") at ¶ 10. Waheedah did not appear at the conference. *Id.* ¶ 11.

On June 6, 2012, ACS filed a neglect petition in Manhattan Family Court. *Id.* ¶ 12. That same day, Manhattan Family Court Judge Clark V. Richardson signed an Order on Application for Temporary Removal of Child. It authorized ACS to remove I.O. and A.A. from their mother's home. Arko Decl. Ex. L. Judge Richardson found that ACS had made reasonable efforts to eliminate the need for removal notwithstanding Waheedah's resistance, and that removal was necessary due to "imminent danger to [the] child." *Id.* at 2.

### 3. The June 6 Incident

#### a. Entry into the Apartment

On June 6, 2012, at approximately 6:30 p.m., Officers Stephan Kroski and Jonathan Rodriguez received a radio transmission advising that ACS workers needed assistance executing

a removal order at the Shaheed apartment. Pl. Counter 56.1 ¶ 14. The officers responded to the building and met with several ACS workers outside. *Id.* ¶ 15. The ACS workers informed the officers that they had an order permitting them to remove children from an apartment in the building. *Id.* ¶ 16. They showed Kroski a document that he reviewed and understood to be a removal order. *Id.*

The officers and ACS workers entered the building. Kroski knocked on the apartment door. *Id.* ¶¶ 17, 19. At this time, only Waheedah, Daghrib, and Noah were in the apartment. *Id.* ¶ 18. Noah opened the door. Kroski informed him that he had a court order authorizing removal of a child from the apartment. *Id.* ¶¶ 20–21.

The parties dispute what happened next. *See id.* ¶ 22. Kroski testified that Noah demanded to see a warrant, pushed Kroski in the chest, and refused to let him enter the apartment. *See* Arko Decl. Ex. E ("Kroski Decl.") ¶ 11. Noah, however, testified that Kroski stuck his foot inside the door and, as Noah tried to "hold [his] ground," grabbed Noah by the wrist and started forcing his way into the apartment. *See* Arko Decl. Ex. J ("Noah Dep.") at 54–55, 59.

Eventually, Kroski and Rodriguez managed to enter the apartment. Pl. Counter 56.1 ¶ 22. Once inside, the officers tussled with Noah as they attempted (ultimately successfully) to place him in handcuffs. *Id.* ¶ 23; *see also* Noah Dep. at 65–67. Rodriguez and Noah wound up falling to the floor together. *See* Arko Decl. Ex. F ("Rodriguez Decl.") ¶ 13.

Meanwhile, Waheedah came out of her room to investigate. Pl. Counter 56.1 ¶ 24. Seeing the police, she demanded that Kroski tell her what the officers were doing in her home. *Id.* ¶ 25. After demanding to see a warrant, Waheedah ordered the officers to leave her home. *Id.*

What followed is also in dispute. All agree that a physical fight broke out involving at least Kroski and Waheedah. *Id.* 26. In Kroski's telling, Waheedah yelled at him and punched him in the mouth, leading Kroski to tackle her and attempt to place her in handcuffs. *See* Kroski Decl. ¶¶ 16–19. In Waheedah's telling, Kroski initiated the confrontation by punching her in the face. *See* Waheedah Dep. at 106, 118. Daghrib's testimony corroborates Waheedah's, stating that Kroski, unprompted, punched Waheedah in the face and "slammed her to the floor." *See* Arko Decl. Ex. H ("Daghrib Dep.") at 66. Kroski testified further that Daghrib jumped on his back and wrapped her legs around his upper body. *See* Kroski Decl. ¶ 22. Daghrib, however, testified that she never attacked Kroski and instead was "grabbed and placed into the kitchen" by an unknown officer. *Id.* at 69, 74. All agree that, at some point, Waheedah "grabbed" Kroski's testicles and squeezed them "as hard as she possibly could." Pl. Counter 56.1 ¶ 27.

Following this scrum, Daghrib was placed in handcuffs. *Id.*. Officer Paul Bliss, who had arrived after receiving Rodriguez's radio call for assistance, then took hold of Daghrib's arm. *Id.* ¶¶ 28–29. Daghrib testified that Bliss "grabb[ed] her left arm so hard that [she felt] a lot [of] pain." Daghrib Dep. at 75. Daghrib testified further that after she informed Bliss that he was hurting her, he "tightened his grip." *Id.*

Waheedah, Daghrib, and Noah were all removed from the building and transported to the 25th Precinct. Pl. Counter 56.1 ¶ 29. Daghrib was then taken to the emergency room, where she complained of a cut and pain to her left arm, and received x-rays and a pain reliever, before she was taken back to the 25th Precinct. *Id.* ¶ 32. She was then taken to Manhattan Central booking, arraigned, and released. *Id.* ¶ 33. Waheedah, meanwhile, was taken to Mount Sinai Hospital, where she was admitted and issued a desk appearance ticket. *Id.* ¶ 34.

The New York County District Attorney's Office charged Waheedah and Daghrib with assault in the second degree, resisting arrest, and obstructing governmental administration. *Id.* ¶ 36. On September 18, 2013, these charges were dismissed and sealed. *See* Arko Decl. Exs. Q, R.

### 4. Continued Investigation and the June 29–30 Incident

On June 13, 2012, Aste learned that I.O. and A.A. had gone to live with their father in Yonkers, New York. Pl. Counter 56.1 ¶ 37. The next day, ACS obtained a court order permitting this living arrangement after it was determined that the father's home did not pose a danger to the children. *Id.* ¶ 38.

On June 25, 2012, however, Aste learned from the father that I.O. and A.A. had returned to Waheedah's home. *Id.* ¶ 39. That same day, Aste went to Waheedah's apartment and, after Waheedah refused to allow her in, spoke to Waheedah through the door. *Id.* ¶ 40.

On June 26, 2012, Judge Richardson signed a second order permitting ACS to remove I.O. and A.A. from Waheedah's home. *Id.* ¶ 41. That afternoon, Aste brought the order to the 25th Precinct, where police informed her that the order was insufficient on its face to permit forced entry should Waheedah refuse to allow entry. *Id.* ¶ 42. Accompanied by police, Aste then returned to the Shaheed apartment, where, after Waheedah refused to allow her in, she once again spoke to Waheedah through the door. *Id.* ¶¶ 43–44.

On June 27, 2012, according to Aste's testimony, Aste returned to the apartment and slipped under the door a "Notice of Existence" of the ACS investigation, an "Order of Protection" against Waheedah in favor of I.O. and A.A., the June 6 and June 26 court orders, and the neglect petitions filed on behalf of I.O. and A.A. Aste Decl. ¶ 24.

On June 29, 2012, ACS obtained a third order from Judge Richardson. Pl. Counter 56.1 ¶ 45. This order found "probable cause to believe that an abused or neglected child may be"

present at the Shaheed apartment. Arko Decl. Ex. N (the "June 29 order"). Accordingly, the order authorized agents, accompanied by police, "to enter the above premises using forcible entry to determine if the children . . . are present and proceed thereafter with a child protective investigation pursuant to § 1034(2)(c) of the New York Family Court Act, and . . . take whatever appropriate actions pursuant to § 690.50(1) of the New York Criminal Procedure Law." *Id.*

Accordingly, on the evening of June 29, 2012, several ACS workers traveled to the 25th Precinct to request assistance with executing the June 29 order. Pl. Counter 56.1 ¶ 47. The police agreed to assist. Several officers accompanied ACS workers to the Shaheed apartment. *Id.* ¶ 48. Of the officers who assisted in executing the June 29 order, only Officer Lydia Figueroa is a defendant here.

On the night of June 29, 2012, Waheedah, Daghrib, Noah, and I.O. were in the apartment. *Id.* ¶ 49. An officer knocked and asked the occupants to open the door. *Id.* ¶ 51. Waheedah instructed Noah not to open the door. *Id.* ¶ 52. Waheedah and Daghrib heard the police say through the door that they had a warrant, but they refused to open the door. *Id.* ¶¶ 53–54. Instead, according to their testimony, plaintiffs asked the police to slide the warrant under the door, which the officers never did. *See* Waheedah Dep. at 175; Daghrib Dep. at 112. In contrast, Figueroa testified that the officers "slid[] a document that [Figueroa] understood to be the court order under the door, but the document was pushed back out into the hallway." Figueroa Decl. ¶ 13.

At an impasse, the police requested backup. Pl. Counter 56.1 ¶ 55. An extensive, hours-long negotiation ensued, during which multiple officers and an imam tried unsuccessfully to convince Waheedah and her family to open the door. *Id.* ¶ 55. Figueroa was not involved in these negotiations. *Id.* ¶ 56.

After several hours, the police forced the door open and entered the apartment. *Id.* ¶ 57. Waheedah, Daghrib, Noah, and I.O. were all in Waheedah's bedroom when the police entered. *See* Waheedah Dep. at 189; Daghrib Dep. at 122. According to Daghrib, six or seven officers entered the apartment with guns drawn, aimed toward the inhabitants, and ordered the family to get down on the floor. *See* Daghrib Dep. at 123. Although Waheedah suggested in her testimony that Daghrib might have "tripped or slipped, or was pushed to the floor," *see* Waheedah Dep. at 191, Daghrib testified that she complied with the order, *see* Daghrib Dep. at 123. Daghrib also testified that the officers pulled Waheedah off the bed by her ankle, *see* Daghrib Dep. at 124, but Waheedah testified that it was I.O. who was pulled off the bed by her leg, *see* Waheedah Dep. at 191.

Ultimately, all agree that both Waheedah and Daghrib were handcuffed and removed from the building. Pl. Counter 56.1 ¶ 59. Although Figueroa was in the apartment building throughout the evening and was later assigned to process Waheedah's arrest paperwork, *see* Arko Decl. Ex. G ("Figueroa Decl.") ¶¶ 6, 11, 25, she never entered the Shaheeds' apartment or observed what transpired inside, never made physical contact with plaintiffs, never pointed her gun at anyone, and did not assist in handcuffing plaintiffs, Pl. Counter 56.1 ¶ 60.

Plaintiffs were taken directly from the apartment building to Harlem Hospital in an ambulance. Pl. Counter 56.1 ¶ 62. At the hospital, Daghrib complained of minor back pain and was given a pain reliever without having x-rays taken. *Id.* ¶ 63. Waheedah reported a headache brought on by stress and lack of food, as well as unexplained soreness in her back. *Id.* ¶ 64.

Daghrib was released from the hospital without being arrested. *Id.* ¶ 65. Waheedah was taken to the 25th Precinct and from there to Central Booking in Manhattan. *Id.* ¶ 66. Thereafter, she was taken to Bellevue Hospital for her back pain, where she received pain medication and an

x-ray. *Id.* ¶ 67. After she was released from Bellevue, Waheedah was returned to Central Booking, where she was arraigned and released. *Id.* ¶ 68. On June 30, 2012, the New York County District Attorney's Office charged Waheedah with obstructing governmental administration. *Id.* ¶ 69; Arko Decl. Ex. O. On April 2, 2014, the charge was dismissed and sealed. Pl. Counter 56.1 ¶ 70.

### B.    Procedural History

On September 12, 2014, Daghrib filed her initial complaint in this action, bringing claims against the City of New York, Kroski, Bliss, Rodriguez, Figueroa, and several "Doe" officers. Dkt. 1. On March 4, 2015, defendants filed an answer. Dkt. 15. On May 4, 2015, Waheedah filed her initial complaint, bringing claims against the same defendants. No. 15 Civ. 3480, Dkt. 1. On August 11, 2015, defendants filed an answer. No. 15 Civ. 3480, Dkt. 11.

On December 28, 2016, this Court consolidated the two cases and set a deadline for the filing of an amended complaint. *See* Dkt. 57.

On January 20, 2017, Daghrib filed her version of the amended complaint. Dkt. 65 ("Daghrib Am. Compl."). The same day, Waheedah filed her version of the amended complaint, No. 15 Civ. 3480, Dkt. 56. ("Waheedah Am. Compl.")

On January 24, 2017, defendants filed a partial motion to dismiss. Dkt. 70. On July 17, 2017, this Court issued an Opinion and Order granting defendants' motion to dismiss all federal claims against the City of New York, as well as all claims against the individual defendants added in the amended complaints. *See* Dkt. 91.

On August 10, 2017, defendants filed a motion for summary judgment, Dkt. 97, a Rule 56.1 statement, Dkt. 98, the Arko Declaration, Dkt. 99, and a memorandum of law, Dkt. 100 ("Def. Mem."). On September 11, 2017, after some ECF filing mishaps, plaintiffs filed their Rule 56.1 counter statement, Dkt. 108, a memorandum of law in opposition, Dkt. 109 ("Pl.

Opp."), and the LaBrew Declaration, Dkt. 110. On September 20, 2017, defendants filed their reply memorandum of law. Dkt. 112 ("Def. Reply").

## II.     Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d

Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

## III.    Discussion

Defendants seek dismissal of (1) all claims arising out of the June 29–30 incident; (2) both plaintiffs' claims for deprivation of substantive due process and intentional infliction of emotional distress arising out of the June 6 incident; and (3) Daghrib's claims for excessive force, assault, and battery arising out of the June 6 incident.  The Court will address each in turn.[2]

### A.    Claims Arising Out of the June 29–30 Incident

Defendants seek summary judgment on behalf of Figueroa and the City[3] on all of plaintiffs' claims arising out of the June 29–30 incident: (1) false arrest and false imprisonment under federal and state law; (2) malicious prosecution under federal and state law; (3) excessive force under federal law and assault and battery under state law; (4) deprivation of substantive due process under federal law; and (5) intentional infliction of emotional distress under state law.[4]

---

[2] The Court notes at the outset that plaintiffs' eight-page opposition brief is, on most issues, profoundly underdeveloped.  Nevertheless, "Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194–95 (2d Cir. 2014).  Accordingly, in evaluating defendants' motion, the Court has canvassed the record and attempted to bring plaintiffs' strongest possible arguments to bear.

[3] Figueroa is the only individual defendant alleged to be personally involved in the June 29–30 incident, while the City remains amenable to suit on plaintiffs' state law claims notwithstanding this Court's prior opinion regarding *Monell* liability.  *See L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002) ("Unlike cases brought under § 1983, municipalities may be liable [under New York law] for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*.").

[4] Each plaintiff brings all of these claims except false arrest and malicious prosecution, which only Waheedah claims.

1.    **False Arrest and False Imprisonment**

a.    **Governing Law**

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996), *cert. denied*, 528 U.S. 946 (1999) (internal citations omitted); *accord Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). And "[t]he common law tort of false arrest is a species of false imprisonment," such that the two share the same elements under New York law. *See Singer v. Fulton Cty. Sherriff*, 63 F.3d 110, 118 (2d Cir. 1995).[5] Accordingly, under New York law, a plaintiff bringing a claim for false arrest or false imprisonment must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Id.* at 118 (quoting *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975)).

The dispute here centers on whether plaintiffs' confinement was privileged. A confinement is privileged where the arresting officer has probable cause to arrest. *See Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003); *Jenkins*, 478 F.3d at 84 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks and citation omitted)). Probable cause exists "when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the

---

[5] Waheedah brings false arrest and false imprisonment claims arising from the June 29–30 incident, whereas Daghrib alleges only false imprisonment.

belief that an offense has been committed by the person to be arrested." *Singer*, 63 F.3d at 119 (internal quotation marks omitted). "When determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citation omitted).

"[P]robable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. 2012) (internal quotation marks and citation omitted); *see also Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) ("[A]n arrest is not unlawful so long as the officer ha[d] . . . probable cause to believe that the person arrested . . . committed any crime."). Where an arrest is supported by probable cause, a person may be arrested for any offense committed in an officer's presence, no matter how minor, so long as that offense is a crime. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Meanwhile, even absent probable cause to arrest the plaintiff, an officer will be entitled to qualified immunity if "arguable probable cause" existed—*i.e.*, if "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation marks and citation omitted). The doctrine of qualified immunity provides a complete defense where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v.*

*City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). The purpose of the doctrine is to "give[]

government officials breathing room to make reasonable but mistaken judgments" and to protect

"all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San

Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted) (quoting

*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

On summary judgment, the existence of probable cause or arguable probable cause may

be determined as a matter of law where "there is no dispute as to the pertinent events and the

knowledge of the officers." *Weyant*, 101 F.3d at 852; *see also McKelvie v. Cooper*, 190 F.3d 58,

63 (2d Cir. 1999).

### b.      Discussion

Plaintiffs allege that they were subjected to false arrest or imprisonment on June 29–30

because they were confined without probable cause. *See* Waheedah Am. Compl. ¶¶ 101–16,

167–71; Daghrib Am. Compl. ¶¶ 97–105, 151–55. The officers lacked probable cause, plaintiffs

argue, because refusing to open the door to their apartment on June 29–30 amounted to "[m]ere

speech," and therefore could not form the basis of probable cause for obstructing governmental

administration. *See* Pl. Opp. at 5–7 (citing *Matter of Davan L.*, 91 N.Y.2d 88, 91 (1997)). For

the following reasons, the Court holds that the officers had at least arguable probable cause to

arrest plaintiffs, and that the false arrest and false imprisonment claims against Figueroa and the

City therefore must be dismissed.[6]

---

[6] Although Figueroa did not enter the apartment or physically effect either plaintiff's arrest, she
did fill out Waheedah's arrest paperwork based on her observations outside the apartment and
information provided by other officers. *See* Figueroa Decl. ¶¶ 25–26. Accordingly, defendants
concede Figueroa's personal involvement. They argue only that the arrest was supported by
probable cause. Def. Mem. at 10–16, 18–20.

"A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force, or interference." N.Y. Penal Law § 195.05. Accordingly, the elements of the crime are: (1) intent; (2) preventing or attempting to prevent the performance of an official function; by (3) intimidation, physical force, or interference. *See People v. Stumpp*, 493 N.Y.S.2d 679, 680 (Dist. Ct. 1985), *aff'd*, 505 N.Y.S.2d 758 (App. Term 1986).

It is undisputed that executing a Family Court order constitutes performance of an official function. The stated purpose of the Family Court Act is to provide a process under which "the state, through its family court, may intervene against the wishes of a parent on behalf of a child." N.Y. Fam. Ct. Act. § 1011. Accordingly, an officer executing a Family Court order acts with the authority of the state on behalf of a child and thereby performs an official function.

Moreover, plaintiffs reasonably could have been understood by an arresting officer to have obstructed the officers' entry through interference. The officers were in possession of a lawful order authorizing entry, *see* June 26 order;[7] the officers announced their intention to execute that order, *see* Pl. Counter 56.1 ¶ 53; and plaintiffs nevertheless refused to open the door, *see* Pl. Counter 56.1 ¶ 54. This is sufficient to generate probable cause to arrest for obstruction of governmental administration. *See Esmont v. City of New York*, 371 F. Supp. 2d 202, 210 (E.D.N.Y. 2005) ("Probable cause to arrest for a violation of § 195.05 may be predicated on, amongst other things, obstructing a lawful search."); *cf. Quon v. Henry*, No. 14-cv-9909 (RJS), 2017 WL 1406279, at *7 (S.D.N.Y. Mar. 27, 2016) (probable cause where plaintiff refused to

---

[7] "A Family Court order is equivalent to a search warrant for Fourth Amendment purposes." *Southerland v. City of New York*, 680 F.3d 127, 144 (2d Cir. 2012).

open door for firefighters who identified themselves and explained that they needed to enter to remedy a fire hazard). That is so, notwithstanding plaintiffs' "mere speech" argument derived from *Davan L.*, because a refusal to act may itself constitute interference under New York law, regardless of any associated speech. *See, e.g.*, *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995) ("When [plaintiff] refused to leave the car, it was reasonable for [officers] to construe her actions as 'interference' and to arrest her for [obstruction of governmental administration].").

Plaintiffs marshal in their defense one New York trial court opinion stating, "although not an issue before the court, it is observed that it is no crime to refuse to open a door to police officers." Pl. Opp. at 6 (quoting *People v. Offen*, 408 N.Y.S.2d 914, 916 (Crim. Ct. 1978)). In *Offen*, however, the police had not secured a warrant. *See Offen*, 408 N.Y.S.2d at 916 (adding that officers might respond to a suspect's refusal to open a door by "obtain[ing] a warrant"). Where, as here, the officers have obtained an entry order akin to a warrant and supported by probable cause,[8] and where the officers have announced their intention to execute that order, refusal to open the door may constitute interference and therefore may generate probable cause to arrest.

The foregoing is sufficient to put to rest plaintiffs' arguments as briefed. Yet the Court has identified one remaining impediment to defendants' motion: Both Daghrib and Waheedah testified that the officers refused to slide the June 29 order under the apartment door for their inspection. *See* Daghrib Dep. at 112; Waheedah Dep. at 175. Defendants, for their part, claim that they did slide the order under the door, only to have it pushed back out. *See* Figueroa Decl. at 2. But because the Court must view the facts in the light most favorable to plaintiffs in

---

[8] *See* N.Y. Fam. Ct. Act § 1034(c) ("[T]he procedure for granting an order pursuant to this subdivision shall be the same as for a search warrant under . . . the criminal procedure law.").

resolving defendants' motion, the Court must assume that defendants refused to furnish the June 29 order for inspection. This, in turn, raises two possible arguments for plaintiffs.

First, plaintiffs might argue that the officers' failure to permit visual inspection of the warrant prior to execution was unreasonable under the Fourth Amendment, in which case plaintiffs could not have been arrested for obstructing a *lawful* search, as required by § 195.05. This argument, however, finds no support in the case law. The Second Circuit has held that a violation of Federal Rule of Criminal Procedure 41(f)(1)(C), which requires an executing officer to provide a copy of a warrant *after* seizing property, is not *per se* an unconstitutional act. *See United States v. Burke*, 517 F.2d 377, 386–87 (2d Cir. 2015). This holding, involving an express requirement of the Federal Rules of Criminal Procedure, strongly suggests that a failure to provide a warrant *before* entry—which is not required by any Federal Rule—likewise is not *per se* unconstitutional. Nevertheless, the Court has not found any opinion so holding, and the Supreme Court has expressly reserved judgment on the question, *see Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004) ("Whether it would be unreasonable to refuse a request to furnish the warrant at the outset of the search when, as in this case, an occupant of the premises is present and poses no threat to the officers' safe and effective performance of their mission, is a question that this case does not present."). This uncertain case law scuttles plaintiffs' claims, as the doctrine of qualified immunity ensures that "[g]overnment actors performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lennon*, 66 F.3d at 420 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Second, and relatedly, plaintiffs might argue that because they never saw the warrant, they could not have formed the intent to obstruct a lawful search—*i.e.*, that they subjectively

believed they were obstructing only an illegal search. But the intent requirement under § 195.05 concerns only the suspect's "intent to prevent the public servant from engaging in a specific official function," *Dowling v. City of New York*, No. 11-CV-4954 (NGG) (RML), 2013 WL 5502867, at *4 (E.D.N.Y. Sept. 30, 2013) (quotation marks omitted), not the plaintiffs' subjective estimation of the lawfulness of the official function. There is no question here that plaintiffs intended to prevent the officers from engaging in the specific official function (entering the apartment) with which they were tasked. *See, e.g.*, Waheedah Dep. at 179. Furthermore, in any event, probable cause to arrest does not require certainty as to intent on the part of an arresting officer; rather, the officer need only have "knowledge . . . sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer*, 63 F.3d at 119 (internal quotation marks omitted). Here, even if the officers refused to furnish the order for plaintiffs' inspection, in the context of a weeks-long ACS investigation involving repeated contact with the same individuals, the officers' clear announcement that they had an entry order, and plaintiffs' unambiguous intent to keep the officers out of their apartment, an officer of reasonable caution easily could have concluded that plaintiffs intended to obstruct a lawful search, and therefore reasonably could have determined that probable cause existed. At minimum, qualified immunity protects such a determination. *See Cerrone*, 246 F.3d at 202–03.

Accordingly, on any theory of false arrest or false imprisonment, the officers are entitled to qualified immunity. And because plaintiffs have not made out a claim against any of the officers individually, plaintiffs' claims against the City fail in turn. *See Wende C. v. United Methodist Church*, 776 N.Y.S.2d 390, 395 (4th Dep't 2004) ("In the absence of any wrongful or actionable underlying conduct . . . there can be no imposition of vicarious liability . . . pursuant

to the doctrine of *respondeat superior*."); *accord Trivedi v. Golub*, 847 N.Y.S.2d 211, 212 (2d Dep't 2007).[9]

### 2. Malicious Prosecution

Just as "probable cause is a complete defense to a constitutional claim of false arrest and false imprisonment, . . . continuing probable cause is a complete defense to a constitutional claim of malicious prosecution." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (citation omitted). The same is true under New York law. *See Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995). Thus, "when a court finds there was probable cause for an arrest, and in the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie." *Johnson v. City of Mount Vernon*, No. 10 CV 7006 (VB), 2012 WL 4466618, at *5 (S.D.N.Y. Sept. 18, 2012); *see also Rizzo v. Edison, Inc.*, 172 F. App'x 391, 393–94 (2d Cir. 2006) ("As no exculpatory evidence became known after Plaintiff's arrest, there was also probable cause to prosecute her."). These principles apply with equal force in the qualified immunity context. *See, e.g., Betts*, 751 F.3d at 82–83 (qualified immunity on false arrest yielded qualified immunity on malicious prosecution); *Pinter v. City of New York*, 448 F. App'x 99, 105 n.6 (2d Cir. 2011) ("[O]ur finding that the officers had arguable

---

[9] It is true that as to federal claims brought under § 1983, qualified immunity "has no bearing on the liability of municipalities." *Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013). That is so because under federal law, municipalities are held liable "if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights." *Id.* Here, in contrast, the Court has already dismissed any claims sounding in municipal policy, *see* Dkt. 91 at14–18, and plaintiffs have not offered any authority suggesting, *contra Wende C.*, 776 N.Y.S.2d at 395, that the City may be held liable for conduct as to which no particular officer may be held liable.

probable cause to arrest Pinter necessarily entitles the defendants to qualified immunity on his malicious prosecution claim as well.").

Here, as explained above, there was at least arguable probable cause to arrest Waheedah. And Waheedah does not allege that any exculpatory facts came to light between her arrest and prosecution. *See* Waheedah Am. Compl. ¶¶ 148–52, 186–90 (alleging only that her prosecution arose from an arrest without probable cause). Accordingly, her claims for malicious prosecution must be dismissed.

### 3. Excessive Force, Assault, and Battery

#### a. Governing Law

"[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical." *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991). In either case, "[p]olice officers' application of force is excessive . . . if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 397; *see also Nimely v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005) (plaintiff alleging battery by police officer under New York state law must prove that the officer's conduct "was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties"). This analysis looks to a number of factors, "including 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016) (quoting

*Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001)). The evaluation of a police officer's use of force must be from the understanding of a reasonable police officer at the incident, and not from hindsight. *Graham*, 490 U.S. at 396.

"[I]t is . . . well established that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a [plaintiff's] constitutional rights.'" *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *18 (S.D.N.Y. Jan. 3, 2013) (second alteration in original) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). After all, "[t]he right to effectuate an arrest does include 'the right to use some degree of physical coercion.'" *Id.* (quoting *Esmont*, 371 F. Supp. 2d at 214). To that end, "[r]easonable arrests tend to involve handcuffing the suspect, and handcuffs lose their effectiveness if they are not attached tightly enough to prevent the arrestee's hands from slipping out." *Id.* (quotation marks omitted). Further, when a plaintiff suffers only a *de minimis* injury, it is harder for the plaintiff to establish that the force used was excessive. *See Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009). Nevertheless, medical treatment is not a required element of an excessive force claim. *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987).

Meanwhile, "[e]ven if defendants' actions were unreasonable under current law, qualified immunity protects officers from the sometimes hazy border between excessive and acceptable force." *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) (alteration and quotation marks omitted). "If the officer's mistake as to what the law requires is reasonable the officer is entitled to the immunity defense." *Id.* (alteration and quotation marks omitted).

In all events, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder

could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

### b.  Discussion

At the outset, plaintiffs' claims of excessive force, assault, and battery arising from the June 29–30 incident fail as against Figueroa for a simple reason:  Figueroa, the only individual defendant present at the apartment that evening, never "entered plaintiffs' apartment, never made physical contact with plaintiffs inside of 26 E. 129th Street, did not point her gun at anyone, did not assist in handcuffing plaintiffs, and did not observe what transpired inside of plaintiffs' apartment." Def. 56.1 ¶ 60.  Plaintiffs do not dispute these facts; instead, they claim only that Figueroa "arrested" Waheedah, citing Waheedah's arrest form signed by Figueroa. *See* Pl. Counter 56.1 ¶ 60.  As there is no allegation that Figueroa applied (or threatened to apply) any force at all, she cannot be held liable for excessive force, assault, or battery.

Meanwhile, as against the City, plaintiffs' claims fail for two independent reasons.  First, plaintiffs have abandoned any claim for excessive force arising from the June 29–30 incident. *See* Pl. Opp. at 7 (addressing only Daghrib's June 6 excessive force claim).  Accordingly, the June 29–30 excessive force claims are properly dismissed. *See Jackson*, 766 F.3d at 196 ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.").

Second, in any event, the only arguable application of force alleged in the complaints is the officers' "point[ing] their rifles at everyone inside the residence" at the conclusion of an hours-long negotiation.  Waheedah Am. Compl. ¶ 69; *see also* Daghrib Am. Compl. ¶ 71. Without more, such allegations are inadequate.  Where, as here, the suspects have not been restrained and the police have not uttered any threats, "[i]t is not objectively unreasonable for

police officers to merely point a gun when executing a search warrant at a private residence."
*Askins v. City of New York*, No. 09 Civ. 10315 (NRB), 2011 WL 1334838, at *3 (S.D.N.Y. Mar. 25, 2011); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877 (KMK), 2015 WL 5730605, at *15 (S.D.N.Y. Sept. 30, 2015) (citing the "vast majority of cases within the Second Circuit hold[ing] that merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law"). Accordingly, the claims for excessive force, assault, and battery must be dismissed.[10]

### 4.    Substantive Due Process

The amended complaints allege that the officers' conduct in arresting plaintiffs without probable cause and beating them in the process so "shock[ed] the conscience" as to create a violation of plaintiffs' right to substantive due process. *See* Waheedah Am. Compl. ¶ 123 ("Plaintiff states that [defendants] denied the Plaintiff substantive due process, and that the intentional conduct of [defendants] 'shocks the conscience' in relation to the Plaintiff's arrest."); *id.* ¶ 124 ("[Defendants] conducted a reckless investigation in that [they] seized/arrested the Plaintiff without probable cause, or arguable probable cause, to believe that the Plaintiff had committed a crime"); *id.* ¶ 126 ("Plaintiff states that she was beaten seized/arrested for not consenting to open her door when [defendants] demanded entry to Plaintiff's residence."); Daghrib Am. Compl. ¶¶ 112–15 (same).

---

[10] In each of their depositions, Waheedah and Daghrib suggested that the other was subjected to some modicum of force not referenced in the pleadings. *See* Waheedah Dep. at 191 ("I don't know if [Daghrib] tripped or slipped, or was pushed to the floor."); Daghrib Dep. at 124 ("One [officer] grabbed [Waheedah] by the ankle and pulled her off of the bed."). Neither plaintiff mentioned such force in her own deposition. *See, e.g.*, Waheedah Dep. at 191 (testifying it was I.O. who was pulled off the bed by her leg). In the face of this conflicting testimony (not to mention plaintiffs' abandonment of the claims), the Court will not allow plaintiffs to insulate each other from summary judgment "simply by testifying . . . to facts *not* alleged in their pleadings." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011).

These claims sound entirely in the Fourth Amendment's prohibition on unreasonable seizures. And where "the Fourth Amendment provides a more 'explicit textual source of constitutional protection,' . . . the Fourth Amendment, rather than substantive due process, should serve as 'the guide for analyzing these claims.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 209 (2d Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Accordingly, the claims for substantive due process must be dismissed. *See, e.g.*, *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 474 n.9 (S.D.N.Y. 2009) ("Plaintiff's allegations of false arrest and malicious prosecution state a claim *only* under the Fourth Amendment, and not under the Due Process Clause of the Fourteenth Amendment.").[11]

### 5. Intentional Infliction of Emotional Distress

"Under New York law, a claim for intentional infliction of emotional distress must satisfy an 'exceedingly high legal standard.'" *DiRuzza v. Lanza*, 685 F. App'x 34, 36 (2d Cir. 2017) (quoting *Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 57 (2016)). First, the tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (citation and quotation marks omitted). And second, a party alleging intentional infliction must plead and prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

---

[11] In their opposition brief, plaintiffs also argue that they were deprived of *procedural* due process. *See* Pl. Opp. at 4 (arguing Waheedah was denied procedural due process because her children were removed without her having "notice and an opportunity to be heard"); *id.* at 8 (arguing that removal of Waheedah's children constituted a substantive due process violation because "[t]here was never an order to enter the home and remove the children"). These claims fall well outside the scope of the pleadings, which do not raise any allegations concerning the removal of children, let alone the procedural aspect of the Due Process Clause. Accordingly, the Court takes no view on the merits of such claims. *See Coram Healthcare Corp. v. Cigna*, No. 00 Civ. 2677 (RMB), 2002 WL 32910044, at *11 ("It is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.").

decency, [so as] to be regarded as atrocious, and utterly intolerable in a civilized community."
*Chanko*, 27 N.Y.3d at 56.

Plaintiffs' claims fail at each step. First, although plaintiffs do not specify what conduct underlies the intentional infliction claims, the amended complaints are directed entirely at defendants' physical violence and plaintiffs' arrests and prosecution. Such conduct clearly "falls well within the ambit of other traditional tort liability" (*e.g.*, claims for assault and battery, false arrest, and malicious prosecution). *Salmon*, 802 F.3d at 256 (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 557–58 (1978)). Plaintiffs therefore have not alleged conduct that is irremediable through traditional tort remedies.

In any event, the Court has already held that the officers acted at all times with at least arguable probable cause. Plaintiffs therefore have failed to provide evidence of conduct "beyond all possible bounds of decency . . . and utterly intolerable in a civilized society." *Chanko*, 27 N.Y.3d at 56.

### B.     Substantive Due Process and Intentional Infliction of Emotional Distress Arising Out of the June 6 Incident

Plaintiffs' state-law claims for deprivation of substantive due process and intentional infliction of emotional distress arising out of the June 6 incident fail for much the same reasons. Like their claims arising from the June 29–30 incident, plaintiffs' claims arising from the June 6 incident sound entirely in false arrest, malicious prosecution, and assault and battery. Their specific claims for deprivation of substantive due process and intentional infliction are no different. *See* Waheedah Am. Compl. ¶¶ 117–21, 172–75; Daghrib Am. Compl. ¶¶ 106–10, 156–59. Because the due process claims sound in the Fourth Amendment, that amendment must serve as "the guide for analyzing these claims." *Graham*, 490 U.S. at 395. And because each of these claims is remediable through the traditional theories of recovery listed above, no claim for

intentional infliction of emotional distress will lie. *See Salmon*, 802 F.3d at 256. Accordingly, plaintiffs' claims for deprivation of substantive due process and intentional infliction of emotional distress arising from the June 6 incident are dismissed.

### C. Daghrib's Claims for Excessive Force, Assault, and Battery Arising Out of the June 6 Incident

Daghrib's excessive force, assault, and battery claims arising from the June 6 incident, analyzed under the same framework set forth above with respect to the analogous June 29–30 claims, currently depend on disputed facts and competing inferences. Viewing the facts in the light most favorable to Daghrib, a reasonable juror could conclude that Bliss's conduct was objectively unreasonable. Accordingly, the Court denies defendants' bid for summary judgment.

Daghrib testified that she witnessed Kroski punch her mother in the face without provocation. Daghrib Dep. at 70. In response, Daghrib testified, she did not attack Kroski, but was handcuffed by Bliss. *See id.* at 74. While this handcuffing alone likely would not constitute excessive force, *see Mesa*, 2013 WL 31002, at *18, Daghrib claims that Bliss grabbed her left arm "so hard that [she] remember[ed] feeling a lot of pain," Daghrib Dep. at 75. She immediately "let him know," after which Bliss "tightened his grip." Daghrib Dep. at 75.

Defendants do not dispute this framing. Instead, they offer—without any legal citation—a two-sentence conclusion that such force is "*de minimis* and not objectively unreasonable." Def. Mem. at 21. The Court is unpersuaded. While a reasonable jury may well conclude that Bliss's use of force was reasonable under the circumstances, Daghrib's testimony might also lead a reasonable juror to conclude that the force used was greater than reasonably necessary. Particularly salient, in the Court's judgment, is the allegation that Daghrib informed Bliss that she was in pain, whereupon he tightened his grip. *See, e.g.*, *Lemmo v. City of New York*, No. 08 Civ. 2641 (RJD), 2011 WL 4592785, at *8 (E.D.N.Y. Sept. 30, 2011) (denying officers summary

judgment on excessive force claim where they tightened "handcuffs . . . to their maximum, for apparently gratuitous reasons," and "kneed and stepped on" suspect's lower back). Viewed in the light must favorable to plaintiff, this arguably gratuitous and/or malicious conduct could be held unreasonable. Accordingly, Daghrib's testimony precludes entry of judgment in defendants' favor as to her June 6 excessive force, assault, and battery claims.[12]

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment insofar as it seeks dismissal of plaintiffs' claims arising out of the June 29–30 incident. Further, the Court dismisses plaintiffs' claims for deprivation of substantive due process and intentional infliction of emotional distress arising from the June 6 incident. However, the Court denies defendants' motion for summary judgment as to Daghrib's claims for excessive force, assault, and battery arising out of the June 6 incident.

The Clerk of the Court is respectfully directed to close the motions pending at No. 14 Civ. 7424, Dkt. 97; and No. 15 Civ. 3480, Dkt. 87. An order will issue shortly as to next steps in this matter.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: March 2, 2018
      New York, New York

---

[12] Likewise, these claims survive as against the City, because a reasonable juror could conclude not only that Bliss's application of force was unreasonable, but also that he acted within the scope of his employment. *See Campos v. City of New York*, 821 N.Y.S.2d 19, 23 (1st Dep't 2006).